Ronnie Russell DAILEY,
Petitioner-Appellee,

v.

Sabel Ann Couch DAILEY,
Respondent-Appellant.

Court of Appeals of Tennessee,
Eastern Section.

Nov. 25, 1981.

Permission to Appeal Denied by
Supreme Court Feb. 16, 1982.

Abby R. Rubenfeld, Cheatham & Palermo, Nashville, for appellant.

Paul H. Dietrich, Dietrich & Dietrich, Cleveland, for appellee.

## OPINION

SANDERS, Judge.

Respondent has appealed from a judgment changing the custody of their minor child from her to the Petitioner.

The Petitioner-Appellee, Ronnie Russell Dailey, and Respondent-Appellant, Sabel Ann Dailey, were divorced in the Circuit Court of Bradley County on December 17, 1980. The Appellant was awarded the divorce on the grounds of irreconcilable differences. Before the divorce a property settlement agreement was reached and it was agreed that the Appellant would have the custody of their minor child, Rusty Dai-ley, then four years of age, with reasonable visitation privileges granted to the Appellee.

The parties separated in July, 1980. Sometime between their separation and the granting of the divorce the Appellant became involved in a homosexual relationship with one Peggy Maynard. Both Appellant and Appellee worked at Magic Chef in Cleveland, Tennessee, at the time and rumors began circulating in the community that the Appellant was a lesbian, but when confronted with the question of her homosexual relationships by the Appellee, she denied them. She also denied them to her family. The day after the divorce Peggy Maynard called the Appellee and apparently told him something about their relationship. On the same day he talked to the Appellant and, although she did not tell him of their homosexual relationship, she told him "that she and Peggy were more than friends, that it was not what I thought."

On January 26, 1981, the Appellant quit her job at Magic Chef and moved to Nashville with Peggy Maynard. She took their minor son, Rusty Dailey, with her but she did not notify the Appellee or his family or any of her family that she was leaving Cleveland. She moved into the home of Peggy Maynard's mother in Nashville where she shares the same bedroom with Peggy. Some three or four days after she left she told the Appellee, in a telephone conversation, of her homosexual relationship with Peggy Maynard. The Appellee then filed a petition for a change of custody of the minor child based upon a change of circumstances. Both the paternal and maternal grandparents filed an intervening petition asking that the custody of the child be granted to the Appellee, but also alleging they would be willing to have the custody of the child awarded to them.

Upon the trial of the case the court found there had been a change in circumstances and the best interest of the child required that his custody be granted to the Petitioner. He also allowed liberal visitation rights to the grandparents and to the Respondent,

including every other weekend visits from Friday evening until Sunday evening with the Respondent in Nashville.

The Respondent has appealed and presented four issues, the thrust of which is whether or not the court abused its discretion in changing the custody of the child from her to the Petitioner. The Appellant admits her homosexual relationship with Peggy Maynard but insists that is not sufficient grounds for the court to find there had been such a change in circumstances as to warrant the change in custody of the minor child. She also says the Petitioner knew of her homosexual relationship before the divorce was granted and the decree awarding the custody of the child to her is *res adjudicata* of that issue. The Appellant relies upon *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003 (1950); *Long v. Long*, Tenn.App., 488 S.W.2d 729 (1972) and *Hicks v. Hicks*, 26 Tenn.App. 641, 176 S.W.2d 371 (1943) as supportive of her contention.

■ We agree that it is a well-settled principle in this jurisdiction that where an award of custody of a minor is made which has no restrictions or limitations it will support a plea of *res judicata* and to justify a petition for a change in custody there must have been such a change in circumstances as will directly affect the welfare of the minor. However, material facts that were not known at the time of the award which may affect the welfare of the child may be subsequently considered. Under T.C.A. § 36–828 a decree concerning the custody of the child "remain within the control of the court and be subject to such change or modification as the exigencies of the case require."

■ In the case at bar the proof does not sustain the contention of the Appellant that the Appellee knew of her homosexual relationship prior to the granting of the divorce. Proof shows the Appellee asked her about whether or not she was a homosexual and she categorically denied it. There is also proof in the record that she flagrantly flaunted her relationship with Peggy Maynard in the presence of the minor child. They would hug and passionately kiss each other and rub the private parts of their bodies while in the home where the child was. They would go to bed together and during their sexual stimulation of each other make audible expressions of pleasure and satisfaction that could be heard throughout the house and in the area where the child slept. They would have the child in bed with them while they were embracing each other in the nude.

The child was five years of age at the time of the trial of this case. He suffers from cerebral palsy and is somewhat handicapped physically and is mentally slow. Because of his handicaps he needs special speech therapy and physical therapy. He also needs careful attention when he is not in school. While living in Cleveland the child was cared for by his grandparents while his parents were both working. The Appellant is an avid softball player and during a three- to four-month period during the summer months the child was cared for by the grandparents in the evenings while the Appellant was playing softball. A very strong bond of affection exists between the child and the grandparents and expert testimony was offered to the effect that the child needed this relationship while away from his parents. The proof shows the child could receive both speech and physical therapy in the public school system in Nashville but it is also available to him in Cleveland, which the Appellee agrees to have provided for him.

Both the Petitioner and Respondent offered expert testimony of psychologists as to how a small child might be affected by being reared by a homosexual mother. The Appellee offered the testimony of Dr. Tom Biller who expressed considerable concern as to the harmful effects that could result to the child by being reared by a homosexual mother. The Appellant offered the testimony of Dr. James Trent who expressed little concern about the child's being reared by a homosexual mother. He seemed to predicate his views primarily on the fact that there was a positive relationship between the child and his mother and there was no evidence of any harmful effects

from his living with his mother up to this time.

Dr. Biller, a practicing consulting psychologist, presented his professional opinion on the effect of homosexual environment upon the child. He testified he had occasion to see and test Rusty Dailey in the presence of his grandparents. He noted several behavioral observations in that Rusty was obviously somewhat limited in coordination and had cerebral palsy, difficulty with speech, and seemed socially immature. He stated Rusty said that he did not like living with his mother because it "drives me crazy to be there" and further stated that his mother lives in Nashville with Peggy Lee Maynard. Rusty stated that Peggy spanks him with a belt and makes him cry. He told Dr. Biller his mother and Peggy Maynard were good friends and he knew they were good friends because "Peggy loves on his mother." It was further testified by Dr. Biller that Rusty seemed to love and cherish his grandparents. He recommended that Rusty, due to his social immaturity and his special needs, needs a supportive, stable, loving home environment to help him mature socially and develop mentally. Dr. Biller further testified that homosexuality is not a widely accepted practice in society in general and particularly not accepted in this region and there was a stronger possibility of an individual to develop instability because of his chosen life style of homosexuality than individuals who chose the norm chosen by society of heterosexuality. He further testified that in his professional opinion it would be damaging to a child whose parents were openly living in a homosexual situation because of peer pressure and social stigma. He stated that homosexuality would be more likely to be learned by one who was exposed to it than by an individual who was not. Given the choice of whether a homosexual relationship involving a mother in the submissive role or a normal relationship wherein males and females adhere to their roles, Dr. Biller voiced his opinion that the situation involving the natural father would be preferable for Rusty. He felt that a homosexual parent who has custody of a young child would be damaging because homosexuality is not a socially accepted practice; that homosexuality is a learned trait and it would be very difficult for Rusty to learn and approximate sex role identification from a homosexual environment.

There was other evidence offered that would support the action of the trial court in changing the custody of the child, but to summarize it would serve only to lengthen this opinion.

We think that unequivocally there has been such change of circumstances as to warrant a change in custody of the child. As was said by the Supreme Court in the case of *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003 (1950), at 1006:

"The determining facts in these adoption and custody cases are so infinite in their variety that the reported decision in one case is of little aid or assistance in settling the next. The supreme rule to which all others should yield is the welfare and best interest of the child."

However, we think it appropriate to refer to a recent Kentucky case of *S v. S*, Ky. App., 608 S.W.2d 64 (1980) where the facts were similar to the case at bar. The court of appeals reversed the trial court for not granting a change of custody from a lesbian mother to the father. In that opinion the court said:

"This Court would call attention to an article entitled 'Children of lesbians: their point of view' contained in the Journal of the National Association of Social Workers, Vol. 25, Number 3, May, 1980, p. 198, *et seq*. This article points out the fact that the lesbianism of the mother, because of the failure of the community to accept and support such a condition, forces on the child a need for secrecy and the isolation imposed by such a secret, thus separating the child from his or her peers."

We think this corroborates the testimony of Dr. Biller in this case.

In the case of *Jarrett v. Jarrett*, 78 Ill.2d 337, 36 Ill.Dec. 1, 400 N.E.2d 421, the Su-

preme Court of Illinois had occasion to address the question of the adverse effects that might be had on three young children by virtue of the mother's having a "live in" boy friend. In that case the mother was awarded the custody of three small children. Shortly thereafter her boy friend moved into the home to live with the mother. The father filed a petition for a change of custody based upon a change in circumstances. The trial court denied the petition. The Supreme Court reversed, holding that such living arrangements were not in the best interest of the children. There the Court said 36 Ill.Dec. at 5, 400 N.E.2d at 425:

"At the time of this hearing, however, and even when this case was argued orally to this court, Jacqueline continued to cohabit with Wayne Hammon and had done nothing to indicate that this relationship would not continue in the future. Thus the moral values which Jacqueline currently represents to her children, and those which she may be expected to portray to them in the future, contravene statutorily declared standards of conduct and endanger the children's moral development."

\* \* \* \* \* \*

"At the time of the hearing the three Jarrett children, who were then 12, 10 and 7 years old, were obviously incapable of emulating their mother's moral indiscretions. To wait until later years to determine whether Jacqueline had inculcated her moral values in the children would be to await a demonstration that the very harm which the statute seeks to avoid had occurred. Measures to safeguard the moral well-being of children, whose lives have already been disrupted by the divorce of their parents, cannot have been intended to be delayed until there are tangible manifestations of damage to their character.

"While our comments have focused upon the moral hazards, we are not convinced that open cohabitation does not also affect the mental and emotional health of the children."

Although we agree with the trial court in his determination of the case insofar as a change of custody is concerned, we do not agree with the unrestricted rights of the Appellant to have the child with her every other weekend from Friday evening until Sunday evening in Nashville as we think it is not in the best interest of the child. We should point out that this issue has not been raised in the Appellee's brief, but we raise it in our own discretion under Rule 13(b), T.R.A.P., and under the mandate of the Supreme Court in *Smith v. Smith*, 188 Tenn. 430, 220 S.W.2d 627 (1949) where the Court said:

"Here though we do not have a chattel or something that can be bandied around or sold or passed title from one party to another, we have a life, a small and young life whose interests must be looked to in growing into fine manhood or womanhood. This being true, it seems to us that when one of these cases comes to the appellate court on appeal, the appellate court has more or less a mixed question of law and fact and it must exercise its judgment under these things in the matter."

\* \* \* \* \* \*

"In view of what we have heretofore said as to the duty of the Court—trial or appellate—in these child custody cases, we are of the opinion that these cases must be reviewed by the appellate Court de novo. In thus reviewing the record— the appellate Court reviewing the case de novo—that Court will give great weight to the decision of the trial court when that Court saw the witnesses face to face and heard them testify.

" 'The decision of the trial judge determinative of the custody of a child or the liberty of a citizen cannot be given the force and effect of the verdict of the jury, or upon waiver of the jury the force and effect of the finding of the trial judge as in law causes reviewable only upon motion for a new trial, as in *Railroad Co. v. Johnson*, supra [114 Tenn. 632, 88 S.W. 169].' *State ex rel. Daugherty v. Rose*, 167 Tenn. 489, 492, 71 S.W.2d 685, 686."

To permit this small child to be subjected to the type of sexually related behavior that has been carried on in his presence in the past under the proof in this record could provide nothing but harmful effects on his life in the future.

The judgment allowing visitation privileges by the Respondent with the child should be modified to prohibit those visitations from being made in the home where the Respondent is living with Peggy Maynard. It should also prohibit the Respondent from having the child in the presence of Peggy Maynard or any other homosexual with whom the Respondent may have a lesbian relationship.

The Appellant, in addition to the other issues, raises a constitutional question in her brief, but it is without merit.

The Appellee also filed a cross appeal asserting that the court should have entered a judgment requiring the Respondent to contribute to the support of the minor child.

Our review of the record reveals this issue was not raised in the trial court. Since the issue was not raised in the trial court, it cannot be raised for the first time on appeal. *Murphy v. Reynolds*, 31 Tenn. App. 94, 212 S.W.2d 686; *McDaniel v. Owens*, 39 Tenn.App. 73, 281 S.W.2d 259; *Thomas v. Noe*, 42 Tenn.App. 234, 301 S.W.2d 391; *Moran v. City of Knoxville*, Tenn.App., 600 S.W.2d 725.

The issue of the custody of the child is found in favor of the Appellee. To the extent the judgment of the trial court is not modified, it is affirmed. The case is remanded for the entry of a judgment in keeping with this opinion and the cost of this appeal is taxed to the Appellant.

PARROTT, P. J., and FRANKS, J., concur.