IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 10, 2008

# IN THE MATTER OF R. R. B.

**Appeal from the Juvenile Court for Dickson County**
**No. 05-07-070-CC    A. Andrew Jackson, Judge**

---

**No. M2007-02347-COA-R3-PT - Filed April 22, 2008**

---

Mother appeals the termination of her parental rights to her nine-year-old child. Her parental rights were terminated on several grounds, including abandonment by failure to provide a suitable home, substantial noncompliance with permanency plan, failure to remedy persistent conditions, and mental incompetence. The trial court also found that termination of Mother's parental rights was in the child's best interest. We affirm the termination of Mother's parental rights based upon Mother's failure to remedy persistent conditions and the best interest of the child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

B. Kyle Sanders, Dickson, Tennessee, for the appellant, H. B.

Robert E. Cooper, Jr., Attorney General and Reporter, and Amy T. McConnell, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

## OPINION

The child, R.R.B., first came to the attention of the Department of Children's Services (the "Department") in December of 2003, at the age of four, when Child Protective Services ("CPS") received a referral alleging the child was suffering from environmental and nutritional neglect. The investigation of this referral revealed that the child had been coming to school during the winter dressed in shorts and was not toilet-trained. The investigation also revealed that the parents, on occasion, did not have enough food to properly feed the child. As a result of the investigation, which was the first of many to follow, CPS placed Family Support Services in the home and had Mother and Father sign a Safety Plan.

Three months later, CPS received a second referral wherein it was alleged that the child had been sexually abused by a relative. Although the allegations were deemed unfounded, due in part to a lack of confirmation and information from the child, CPS deemed it appropriate to modify the Safety Plan. Both parents signed the new Safety Plan. Within the year, in December of 2004,

another referral of sexual abuse was reported to the Department, which resulted in a determination by CPS that both parents were, as the record states, "indicated for substantiated sexual abuse," meaning they had failed to take reasonable measures to protect the child from abuse by others residing in or visiting the home. As a consequence of this finding, a third Safety Plan was established that required both parents to undergo counseling and to take appropriate measures to ensure the suspected sexual perpetrator had no future contact with the child.

Five months later, the Department was advised that the child had been taken to the hospital due to an overdose of his psychotropic medication. As a consequence of this referral, and the previous three, the trial court issued an emergency protective custody order on May 19, 2005, placing the child in the temporary custody of the state. By Order dated June 22, 2005, both parents stipulated that the child was dependent and neglected and that the child remained in the custody of the Department, residing with foster parents, where he remains to this date.

Thereafter, a social worker from Lutheran Services, an agency engaged by the Department, began conducting in-home therapeutic visitation and counseling with the parents and the child. The social worker would transport the child for periodic supervised visitation with the parents in the parents' home. The social worker also endeavored to counsel both parents so they could provide consistent medical and mental healthcare for the child, which the child desperately needed due to his many needs and disabilities. The social worker also endeavored to assist the parents so they could achieve the goals of the Permanency Plan. During the two years that followed, the social worker traveled to the parents' home an average of three times per month to render the foregoing assistance and counseling and to participate in the therapeutic visitation.

A second Permanency Plan was agreed to by both parents on May 5, 2006, the goal of which was reunification. Pursuant to the second plan, Mother was to: (1) provide consistent medical and mental healthcare to the child by keeping a calendar system; (2) obtain a parenting assessment and follow the recommendations; and (3) be able to provide financially for the child. Although the trial court approved the second Permanency Plan on May 17, 2006, the court expressed concern with the goal of reunification due to the therapist's stated concerns that the child experienced great anxiety evidenced by encopresis[1] following visitation with Mother and Father.[2]

As part of the requirements of the Permanency Plan, a parenting assessment was administered to both parents in May of 2006. The assessment indicated that both parents had weaknesses in all areas of the parenting assessment and that they were "more unskilled than skilled." In the assessment report it was recommended that both parents participate in family and individual counseling and in parenting education.

---

[1] Encopresis has several manifestations including defecating on one's self, which the child did repeatedly following visitation with the parents.

[2] The goals for Father are not listed as he does not appeal the termination of his parental rights.

Following the parenting assessment, the Department arranged for in-home counseling services for both parents. An agency known as Family Solutions was retained to provide these indicated services, including parenting education, for the months of June and July, 2006. The child's father, however, stopped participating shortly after Family Solutions starting working with the family. Although Mother consistently participated with Family Solutions for a few weeks, she failed to communicate with or contact Family Solutions after spending two weeks in the hospital with acute psychosis involving auditory and visual hallucinations.

Neither parent completed the parenting education provided through Family Solutions. To complicate her already tenuous situation, Mother was arrested for filing a false police report in July of 2006. She falsely reported that she had been assaulted and robbed of her prescription drugs in a parking lot in a failed attempt to get replacement pills for the "stolen" medication.

Mother has a long history of significant psychological and mental health problems. She has been diagnosed with major depressive disorder, severe and persistent mental illness, congestive heart and lung failure, multiple sclerosis, and surgical anorexia. She has suffered two strokes and she states that she also suffers from asthma, fibromyalgia, neuropathy, osteoarthritis, osteoporosis, kidney stones, bulging discs, and migraines.

On August 11, 2006, Mother underwent a psychological evaluation at Centerstone.[3] The assessment, known as the Minnesota Multi-phasic Personality Inventory (MMPI), indicated that Mother had depressive symptoms, difficulty with coping skills for managing stressors, self-centeredness, poor judgment, impulsivity, and excessive bodily concerns. The therapist who administered the psychological evaluation testified that the results of the MMPI evaluation suggested that the relationship between Mother and the child was "at risk" for development of a dysfunctional pattern of parenting behaviors. The therapist also testified that it would be difficult for Mother to be an effective parent given her preoccupation with medical problems and her emotional functioning.

Although Mother has received the benefit of a number of educational services, including medication management, marriage counseling, and individual counseling, she began a pattern in August of 2006 of cancelling her appointments at Centerstone. Following a brief but consistent period of cancelling her appointments, Mother has since refused to seek treatment at Centerstone.

The trial court conducted a Review Hearing on September 27, 2006, at which time the court learned that Mother had not complied with the court's order to obtain a drug and alcohol assessment. As a consequence of her non-compliance with the court's order, visitation with the child was suspended; however, therapeutic visitations were reinstated following the Review Hearing on December 13, 2006.

---

[3]The assessment was a consequence of being charged with filing a false police report. The criminal court also ordered her to undergo a drug and alcohol assessment and placed her on probation.

On May 11, 2007, a year after the second Permanency Plan was implemented, the Department filed its petition to terminate the parental rights of both parents. In the petition, the Department contended, *inter alia,* that the conditions that led to the removal of the child still existed and that termination of the parties' parental rights was in the best interest of the child. The matter went to trial on September 14 and 19, 2007. One the first day of trial, Father surrendered his parental rights. Thus, the trial focused solely on whether Mother's parental rights should be terminated. By Order dated September 28, 2007, the trial court granted the Department's petition to terminate Mother's parental rights on multiple grounds, including the ground that the conditions that led to the removal of the child still existed. The court also found that termination of her parental rights was in the best interest of the child. This appeal followed.

Mother appeals contending, *inter alia,* there is insufficient evidence of the persistence of conditions that led to the removal of the child and insufficient evidence that the termination is in the best interest of the child.[4]

## ANALYSIS

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence.[5] *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's

---

[4]Mother challenged the other grounds for termination; however, our ruling as to persistence of conditions renders the other grounds moot.

[5]The clear and convincing evidence standard is a heightened burden of proof which serves to minimize the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. *In re C.W.W.*, 37 S.W.3d at 474. It is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. 745, 766 (1982); *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), yet it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn. Crim. App.1987). Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence, *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992), and it should produce a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

There have been varying descriptions of the standard of review this court is to apply when reviewing a trial court's decision in a termination of parental rights case. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed). Our Supreme Court, however, recently indicated that the question of whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). A similar standard was stated in *In re Valentine*, 79 S.W.3d at 546, wherein the Supreme Court stated that the question of substantial noncompliance with the requirements of a permanency plan was a question of law; therefore, it is reviewed *de novo* with no presumption of correctness. *Langschmidt v. Langschmidt,* 81 S.W.3d 741, 744-45 (Tenn. 2002).

## PERSISTENT CONDITIONS

One of the grounds for termination of a parent's rights is that the child has been removed from the home of the parent or guardian by order of a court for a period of six months and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

Although Mother's repeated failure to comply with the Safety Plan requirement that she not permit a sexual offender to be alone with the child is a matter of grave importance, Mother's inability to effective and safely parent the child is also of great significance. This circumstance is further aggravated by the fact the child has special needs and, therefore, is more vulnerable and in need of effective parenting than most children.

-5-

Three safety plans had been attempted, unsuccessfully, prior to the child's removal in 2004, which was necessitated following her administration of an overdose of the child's medications and was so serious that the child required hospitalization. The unfortunate event in 2004 proved to be the tip of the iceberg of her inability to parent the child, in that it disclosed the special needs of the child and Mother's chronic inability to parent the child due to her many deficiencies and maladies.

The child has been diagnosed with several disorders, including bipolar disorder, ADHD, asthma, and obsessive-compulsive disorder, to name a few. For her part, Mother suffers from countless physical conditions and mental health problems. To compound the dichotomy of the child's special needs and Mother's parenting deficiencies, Mother has failed to take advantage of the many valuable services the Department has attempted to provide, which would have given her a substantially greater chance of being reunited with the child. For example, she failed to complete scheduled individual therapy appointments at Centerstone, which were required as a result of her psychological evaluation, and at trial she had no proof that she was receiving treatment from any provider. Moreover, she failed to complete the parenting education that would have helped her meet, or at least given her a reasonable chance to meet, the child's numerous and significant needs. As of the date of trial, Mother lived by herself and had no vehicle or support system due in part to the fact her sister and daughter, who had previously provided assistance, had ceased doing so and had taken away her vehicle due to safety concerns.

Mother admits to failing to meet or complete the goals of the Permanency Plan. And up to the day of trial, Mother had admitted that she was not in a position to have the child live with her and was not in a position to take care of him.

Despite extensive efforts by the Department, which included providing access to in-home therapeutic visitation, in-home parenting classes, parenting assessments, and individual and marital counseling, conditions still persisted at the time of trial that prevented the child's safe return to the care and custody of Mother. Based on the foregoing facts and the record as a whole, we affirm the trial court's determination that the conditions that led to removal persisted and would in all probability lead to further neglect and abuse of the child.

### THE CHILD'S BEST INTEREST

The trial court also found that termination of Mother's parental rights was in the child's best interest. In determining whether termination of parental rights is in the best interest of the child, Tenn. Code Ann. § 36-1-113(i) directs that the court is to consider certain statutory factors including the following:

> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . ;
> (2) Whether the parent has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent . . . has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent, or other person residing with the parent, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child . . . ;

(7) Whether the physical environment of the parent's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

After considering each of the foregoing factors that are relevant to this case, a reasonable person could only come to one conclusion, which is that it is no longer in the best interest of the child to continue this parent-child relationship. Mother has consistently been unable to care for the child in a safe and stable manner, and her mental and emotional status is detrimental to the child such that it prevents her from effectively providing safe and stable care for the child. The trial court found, and we agree, that Mother failed to make lasting changes after reasonable efforts by the Department for two years prior to trial. As a consequence, Mother is not capable of parenting the child. We, therefore, affirm the trial court's determination that termination of Mother's parental rights is in the best interest of the child.

**IN CONCLUSION**

The judgment of the trial court is affirmed and this matter is remanded with costs of appeal assessed against the Department of Children's Services, due to Mother's indigency.

_____

FRANK G. CLEMENT, JR., JUDGE